**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STEVEN TINDAL,

              Plaintiff,

              v.

JOHN MCHUGH,
*in his official capacity as Secretary of the Army*,

              Defendant.

Civil Action No. 10-237 (BAH)

Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

The plaintiff Steven Tindal brings this action against the defendant Secretary of the Army pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500, *et seq.*, seeking to set aside the decision of the Army Board for Correction of Military Records ("the Board" or "the ABCMR"), which denied the plaintiff's request to be reinstated to Reserve active status, promoted to the rank of Lieutenant Colonel, and transferred to the Oregon Army National Guard. The plaintiff served in an active-duty capacity in the United States Army for over twenty years. Following his retirement in September 2002, he twice appealed to the Board, claiming that he had filed a request to extend his active-duty service and thus that his retirement was an injustice that required correction. The Board denied his appeals, and the plaintiff now seeks to overturn the Board's most recent denial as arbitrary and capricious and unsupported by substantial evidence. Both parties have filed motions for summary judgment, and the plaintiff has also filed a motion to supplement the administrative record with further evidence.

## I.      BACKGROUND

Since this is an administrative law case, the Court will first discuss the regulatory framework underlying the agency's decision before discussing the facts and the procedural history.

### A.      <u>Regulatory Framework</u>

This case implicates a somewhat labyrinthine collection of United States Army personnel regulations governing how soldiers are administratively processed, particularly when they reach a certain maximum level of service.  As discussed more fully below, the plaintiff was at all times relevant to this lawsuit a member of the Army Active Guard Reserve ("AGR"), and so the Court will discuss the Army's personnel regulations as they apply to participants in the AGR program.

Under Army regulations, "[a]ll AGR officer personnel will be released from [active duty] or [full-time National Guard duty] when they have attained 20 years and 1 month of qualifying service for retirement purposes . . . unless they have been approved for voluntary retention under [Army Regulation] 600-8-24."  Army Reg. 135-18 ¶ 4-12 (1996).[1]  If a soldier wants to request an extension of his active-duty service, known as "selective retention," such a request "will be submitted when the soldier completes 19 years of such service" and "will be sent through command channels."  *See id.*  The "command channels" through which such requests must be sent depends upon whether the AGR soldier is serving in a federal or state chain of command.[2]

---

[1] The Court will cite all Army regulations as "Army Reg. __" rather than as "AR ___" to avoid confusion between citations to Army regulations and citations the Administrative Record.  The Court cites to the version of the pertinent Army regulations that were in place in 2002, when the plaintiff retired.

[2] The AGR program is a federal program that has both federal and state components due to "the murky and mystical duality of the National Guard system."  *See Bowen v. United States*, 49 Fed. Cl. 673, 676 (2001).  The AGR program places Army National Guard and Army Reserve soldiers on either federal active-duty status, *see* 10 U.S.C. § 12310, or full-time National Guard duty, *see* 32 U.S.C. § 302(f), in order provide full-time support "for organizing, administering, recruiting, instructing, or training the [Army National Guard] or the [Army Reserve]," *see* Army Reg. 135-18 ¶ 1-1.  "Thus, the AGR includes a member of the [Army National Guard] serving on full-time National Guard duty in state status, and it also includes the same member when he or she is called to active duty in his or her federal status."  *Freeman v. United States*, 98 Fed. Cl. 360, 364 (2011).

*See id.*  For an AGR soldier serving in the Army National Guard (*i.e.*, the state chain of command), the requests would be sent to the National Guard Bureau ("NGB").  *See id.*

Retirement from the AGR based upon maximum years of service can be either voluntary or involuntary.  "A mandatory retirement is required by law and is initiated by [the Headquarters of the Department of the Army]."  Army Reg. 600-8-24 ¶ 6-24a (2002).  On the other hand, "a voluntary nonwaiver retirement" may be requested by an officer, and "it is Army policy to approve a voluntary nonwaiver retirement application when an officer will have served at least 20 years of active Federal service as of the requested retirement date."  *Id.* ¶ 6-14a; *see also id.* ¶ 6-20 (outlining steps for processing a voluntary retirement application).  Hence, voluntary retirement in the AGR program is initiated by the soldier who applies for such retirement, and involuntary retirement is initiated by Army Headquarters and proceeds by operation of law.  The timing of an AGR soldier's retirement, however, is not necessarily correlated to whether the retirement was voluntary or involuntary because "[a]n officer may request retirement and be retired voluntarily on his or her mandatory retirement date."  *See id.* ¶ 6-24a; *see also id.* ¶ 2-23d ("The officer's separation will not be delayed past the scheduled release date due to nonsubmission or late submission of a voluntary retirement request.").

Related to both retirement and selective retention, a soldier is required to meet certain minimum medical and fitness criteria.  For example, in order for a soldier to be retained and "selected for subsequent duty in the AGR Program," he "must possess" certain minimum qualifications, including certain "Physical and Medical" qualifications.  *See* Army Reg. 135-18 ¶ 2-4b & tbl. 2-4; *see also* Army Reg. 40-501 ch. 3 (2002) (laying out "Medical Fitness Standards for Retention and Separation, Including Retirement").  These qualifications include "body composition/weight control standard[s]" and "medical fitness standards."  Army Reg.

135-18 tbl. 2-4.  Generally, medical evaluation of whether active-duty soldiers meet minimum

physical requirements is only initiated "when a question arises as to the Soldier's ability to

perform the duties of his or her office, grade, rank, or rating because of physical disability" or a

soldier's commanding officer "believes that a Soldier of their command is unable to perform the

duties of their office, grade, rank, or rating because of a physical disability."  *See* Army Reg.

635-40 ¶¶ 4-6, 4-8 (1990).

As to retirement, "[m]edical examination prior to retirement is required," and "will be

scheduled not earlier than 4 months prior to the retirement date."  Army Reg. 600-8-24 ¶ 6-6.

"When a soldier is being processed for separation or retirement for reasons other than physical

disability," however, "continued performance of assigned duty commensurate with his or her

rank or grade until the solder is scheduled for separation or retirement, creates a presumption that

the soldier is fit."  Army Reg. 635-40 ¶ 3-2(b)(2).  This presumption may be overcome if, *inter*

*alia*, "[a]n acute, grave illness or injury or other significant deterioration of the soldier's physical

condition occurred immediately prior to, or coincident with processing for separation or

retirement for reasons other than physical disability and which rendered the soldier unfit for

further duty."  *Id.* ¶ 3-2b(2)(b).

In addition to these general medical and fitness requirements, there are two Army

administrative systems relevant to this case, which are designed to evaluate soldiers' fitness for

duty.  The first is called the Physical Performance Evaluation System ("PPES"), which is

"designed to evaluate soldiers who have been issued a permanent physical profile with a

numerical designator of 3 or 4 . . . to determine if they have the physical ability to satisfactorily

perform their primary military occupational specialty (PMOS) . . . worldwide and in a field

environment." *See* Army Reg. 600-60 ¶ 2-1.[3] The PPES establishes an "administrative screening board" called the Military Occupational Specialty/Medical Retention Board ("MMRB") to make this determination. *Id.* Referral to an MMRB is required, *inter alia*, when a soldier is issued a permanent physical profile with a numerical designator of 3 or 4, *see id.* ¶ 2-2, though referral to an MMRB is not *per se* required as a part of the selective retention process. A soldier is exempted from mandatory referral to an MMRB if he is "[a]n active duty officer who is within 1 year of [the] date of mandatory retirement for age or length of service" unless he has "sufficient time remaining to be eligible for reassignment and receive assignment instructions." *See id.* ¶ 2-3f. After evaluating a soldier, the MMRB may recommend either (1) retention of the soldier's PMOS; (2) placing the solider in a probationary status; (3) reclassification of the soldier's PMOS; or (3) referral of the soldier to the Army's Physical Disability Evaluation System ("PDES"), *see id.* ¶¶ 4-17 to 4-20, which is the second administrative system relevant to the instant case, discussed below. Any enlisted soldier "pending MMRB action and follow-on determinations may not re-enlist," though "[i]f otherwise qualified, they may extend their current enlistment" in accordance with Army regulations. *See id.* ¶ 3-7a. If a soldier is "retained in [his current] PMOS, reclassified into another PMOS, or found fit by the PDES, re-enlistment or extension of enlistment will not be denied on medical grounds." *Id.* ¶ 3-7c.

The PDES, much like the PPES, is concerned with "determining whether a Soldier is unfit because of physical disability to reasonably perform the duties of his or her office, grade, rank, or rating." *See* Army Reg. 635-40 ¶ 1-1. Similar to the screening role played by the MMRB in the PPES process, a medical evaluation board ("MEB" or "MEBD") is involved in the PDES process. *See id.* ¶ 2-10a. "MEBD's are convened to document a soldier's medical status

---

[3] "The basic purpose of the physical profile serial system is to provide an index to overall functional capacity," and "[f]our numerical designations are used to reflect different levels of functional capacity." *See* Army Reg. 40-501 ¶ 7-3b. The numerical designators 3 and 4 are the lowest levels of functional capacity. *See id.* tbl. 7-1.

and duty limitations insofar as duty is affected by the soldier's status," *id.* ¶ 4-10, and a soldier is generally referred to an MEBD, like an MMRB, when a question arises about the soldier's ability "to perform the duties of his or her office, grade, rank, or rating because of physical disability," *see id.* ¶¶ 4-6, 4-8.  A soldier may also be referred to an MEBD by the MMRB,[4] *see* Army Reg. 600-60 ¶ 4-20, and referral to an MEBD is required if a soldier has certain medical conditions, including diabetes mellitus, "when proven to require insulin or oral medications for control."  *See* Army Reg. 40-501 ¶ 3-11d.

## B.   Factual and Procedural Background

In March 1976, the plaintiff enlisted in the U.S. Army.  *See* Admin. R. ("A.R.") at 269–70, ECF No. 15-6.  After completing just over three years of active service, the plaintiff was honorably discharged on February 29, 1980.  *See id.* at 267; *see also* Def.'s Statement of Facts ("Def.'s Facts") ¶ 2, ECF No. 16-2.  In December 1982, the plaintiff was appointed as a Second Lieutenant in the South Carolina Army National Guard.  *See* A.R. at 6, 251–52.  The plaintiff was promoted to the rank of First Lieutenant in December 1985, *see id.* at 226, and to the rank of Captain in November 1988, *see id.* at 6, 207.  On September 30, 1993, the plaintiff was transferred to the Oregon National Guard, *see id.* at 193–97, and in October 1994, the plaintiff was first ordered to active duty in the AGR program, *see id.* at 6, 185–86.  In February 1997 the plaintiff was promoted to the rank of Major.  *See id.* at 6, 168.  Also, in November 1997, the plaintiff was diagnosed with diabetes mellitus, which he "controlled . . . with exercise, diet, and limited oral medication."  *See* Am. Compl. ¶ 5, ECF No. 13; A.R. at 122.  The plaintiff was subsequently issued a "'3-P' permanent profile" in 1998 as a result of his diabetes diagnosis, though he "was not referred to an MMRB" at that time.  *See* Am. Compl. ¶¶ 6, 9.

---

[4] Due to the close similarities between the PDES and PPES, it is unclear when a soldier is referred first to an MMRB, rather than being directly referred to an MEBD.

In December 2001, the plaintiff was notified that he would be released from active duty and transferred to the Retired Reserve on August 31, 2002, after having accrued twenty years of active federal service.  *See* Def.'s Facts ¶ 11.  At some unspecified time in 2002, the plaintiff submitted a request for voluntary retirement.[5]  *See id.* ¶ 12; A.R. at 6.  The plaintiff claims that in or about February 2002, he requested selective retention in the AGR program.  *See* Am. Compl. ¶ 21.[6]  Also at some point in 2002, the plaintiff was processed through either an MMRB or an MEBD, though it is unclear from the record when or how the medical referral was initiated and what the outcome of the medical referral was.  *See* A.R. at 12; Pl.'s Opposing Statement of Facts ("Pl.'s Facts") ¶ 11-B, ECF No. 22-2; Am. Compl. ¶ 19.[7]  The plaintiff alleges in his Amended Complaint that he was referred to an MMRB in June 2002, and that his "MMRB later unfavorably referred him to a follow-on MEB as not deployable and for further disability processing."  *See* Am. Compl. ¶¶ 31, 33.  On July 23, 2002, the plaintiff was once again notified that, pursuant to his application for voluntary retirement, he would be retired from active duty and transferred to the Retired Reserve, effective August 31, 2002.  *See* A.R. at 145.  In accordance with this notice, the plaintiff was in fact released from active duty on August 31, 2002, after serving twenty years, one month, and twenty-four days of active federal service.  *See id.* at 125, 145.

---

[5] Although the parties do not dispute that the plaintiff submitted a voluntary retirement request, there is no documentation in the Administrative Record showing when exactly this request was submitted or received.  Indeed, it is unclear from the Administrative Record whether the plaintiff's voluntary retirement request was submitted before or after his purported selective retention request, or whether they were submitted simultaneously.  Despite the fact that the Administrative Record contains 137 pages of the plaintiff's personnel records, stretching from 1976 to 2003, *see* A.R. at 134–210, the Administrative Record contains no documentation of the plaintiff's voluntary retirement request.  The plaintiff alleges in his Amended Complaint that the retirement request was submitted "concurrently" with his retention request and that he "was told that if the request for extension was approved, NGB would pull the retirement papers."  *See* Am. Compl. ¶ 26.

[6] In his original Complaint, the plaintiff alleged that he submitted this extension request in January 2002.  *See* Compl. ¶ 26, ECF No. 1.

[7] The Amended Complaint contains two paragraphs denominated as paragraph 19.  *See* Am. Compl. at 6.  All citations to paragraph 19 of the Amended Complaint in this Opinion are to the paragraph 19 listed first in the Amended Complaint.

The plaintiff's personnel record reflects a long and distinguished career in military service.  On October 20, 2002, the plaintiff received the Meritorious Service Medal for his twenty years of "exemplary service coupled with his superb technical expertise."  *See* A.R. at 138.  His commanding officers also consistently and enthusiastically recommended him for promotion to the rank of Lieutenant Colonel.  *See id.* at 140–41 ("Promote when eligible."); *id.* at 147 ("Promote to lieutenant colonel and give him every opportunity for our best professional development schools."); *id.* at 153 ("MAJ Tindal is Battalion command material and should be considered when eligible.").  On September 4, 2002, a promotion board selected the plaintiff for promotion to the rank of Lieutenant Colonel, but the promotion selection was declared null and void due to the plaintiff's transfer to the Retired Reserve prior to the approval date of his promotion.  *See* Def.'s Facts ¶ 16; A.R. at 118, 134.

On September 9, 2005, the plaintiff submitted an application to the Board,[8] requesting reinstatement to active duty in the AGR program, promotion to the rank of Lieutenant Colonel, and transfer to the Oregon Army National Guard.  *See* Def.'s Facts ¶ 17; A.R. at 120–23.  In his original application, filed *pro se*, the plaintiff contended that he had "been unjustly treated compared to [his] Active Component counterparts" because "the National Guard requirements and policies are more restrictive than the Active Component."  *See* A.R. at 122.  Specifically, the plaintiff contended, "if I had been a Regular Army officer, I would have been able to serve 24 years at my rank," but "because I was a member of the Army National Guard and not the Regular Army, I was not given the opportunity to continue my career and retire as a Lieutenant Colonel or possibly a higher rank."  *Id.* at 121.  The plaintiff also mentioned in his submission to the Board that "[t]he Oregon National Guard tried to extend me before my retirement date;

---

[8] "The Army Board for Correction of Military Records ('ABCMR'), a civilian review board, is empowered to review applications for the presence of an error or injustice and make recommendations for corrective action."  Def.'s Mem. in Supp. Mot. for Summ. J. ("Def.'s Mem.") at 1 n.1, ECF No. 16-1.

however, the time ran out to my retirement date without any positive results." *Id.* at 122. Further, the plaintiff stated that the NGB had "directed that [he] go through a Medical Evaluation Board," and that although "Mr. Grant Moyer, the Medical Evaluation Board director . . . stated [he] would not have to go through an MRB to stay on Active Duty," he nevertheless "had to go before an MRB." *Id.* In short, the plaintiff argued in his original appeal to the Board that he had been treated unfairly because he was forced to retire after twenty years of active service, while officers in the regular Army component could serve in active duty in the rank of Major for up to twenty-four years. On August 31, 2006, the Board considered the plaintiff's arguments and evidence, including his Board application and his military personnel records, and the Board denied his request for relief. *See id.* at 115–18.

On February 26, 2010, the plaintiff filed his original Complaint in the instant action. In his Complaint, the plaintiff presented a different version of the arguments he advanced before the Board. In particular, the plaintiff alleged that "[h]e attempted to argue that while his [active federal service] extension was pending, NGB directed that he go through a useless Medical Evaluation Board and MRB to determine if he was physically fit to continue with his career." *See* Compl. ¶ 35, ECF No. 1. The Complaint further alleged that the plaintiff "was referred to an MEB for diabetes, but that condition was never an issue that affected his performance." *Id.* In this regard, the plaintiff alleged that "the [NGB] in May 2002 directed Major Tindal be processed for disability retirement through a MEB and MMRB, both at Fort Jackson S.C." *Id.* ¶ 27. The plaintiff complained that "[t]he Board did not address the MEB or MMRB issues, nor the injustice of NGB insisting on these boards until the clock ran out on Tindal's extension request." *Id.* ¶ 36. Although conceding that "it was not explicitly clear that [the plaintiff] was invoking the equitable powers of the Board to retroactively approve his [extension] request," he

claimed that "there is some evidence in the record to suggest that he did."  *Id.* ¶ 41 (quoting *Calloway v. Brownlee*, 366 F. Supp. 2d 43, 55 (D.D.C. 2005)).

On June 17, 2010, the parties filed a joint motion to remand the case to the Board.  *See* Consent Mot. for Voluntary Remand to Agency ("Mot. to Remand"), ECF No. 7.  In that motion, the parties stated that "Defendant seeks to withdraw the final agency decision . . . and remand the action to the [Board] to reconsider its decision."  *Id.* at 1.  In light of the plaintiff's equitable arguments regarding his purported extension request, which were not clearly raised before the Board the first time around, the defendant "agree[d] that remand to the [Board] is appropriate so that the board can further analyze the limited issue of whether the [NGB] failed to timely act upon Plaintiff's extension request and, if so, whether such failure is an error, injustice or inequity supporting the relief that plaintiff seeks."  *Id.* at 3.  The joint motion also made clear that "[o]n remand, the [Board] will not consider any other arguments that Plaintiff raises in his complaint."  *Id.*  This precluded review of the plaintiff's "novel arguments" regarding the equitable remedies of estoppel, tolling, and "lulling."  *See id.* at 3–4; *see also* Compl. ¶ 39.  The defendant agreed to have the Board consider the limited issue regarding the plaintiff's purported extension request, "all of the relevant evidence that Plaintiff previously submitted to the [Board]" and three new pieces of evidence, which included two academic research papers from students at the U.S. Army War College and a previous Board decision.  *See* Mot. to Remand at 3–4.  The previous presiding judge in this case granted the parties' motion and remanded the matter to the Board for further consideration.  *See* Consent Remand Order, ECF No. 9.[9]

After the plaintiff submitted a new application for relief, the Board, on September 30, 2010, once again denied the relief requested.  *See* A.R. at 4–14.  The Board made two primary conclusions in arriving at its decision.  First, it concluded that "there is no evidence in [the

---

[9] This case was assigned to the current presiding judge on January 20, 2011.

plaintiff's] records and he did not provide any evidence that he requested retention in the AGR program prior to his retirement." *Id.* at 12.  Second, the Board concluded that, even assuming the plaintiff had submitted an extension request, (1) "the [plaintiff's] MEB had no impact on his ability to submit an extension request and did not prevent him from submitting a request much earlier," (2) "[h]ad such a request been submitted earlier, it appears the NGB could have had it approved with a waiver or pending the MMRB," and (3) "there is no evidence that [the plaintiff's purported extension request] was submitted early enough to allow the NGB to process it prior to his retirement." *Id.* at 12–13.  More generally, the Board noted that "[a]ssuming [the plaintiff] did submit a request for an extension and it could not be processed before he retired, the delay in submitting the request was of his doing, and he cannot complain now that he is due relief because his voluntary retirement was not delayed." *Id.* at 13.

On November 22, 2010, the plaintiff filed an Amended Complaint, asking the Court to set aside the Board's September 2010 decision under the APA.  *See* Am. Compl. at 1.  This time, the plaintiff alleged that "[t]he record shows that Tindal's extension request was in fact submitted because NGB medically flagged the application for Tindal's 3P permanent profile for diabetes," and thus the plaintiff alleged that "NGB initiated an MMRB for purposes of AGR continuation." *See id.* ¶ 19.[10]  Further, the plaintiff contended in his Amended Complaint that "[t]he record implies that the NGB referral to an MMRB in June 2002 had the effect of suspending a[n] extension request to continue AGR service." *Id.* ¶ 31.  The plaintiff also included in his Amended Complaint, for the first time, what he claims is "the actual request forwarded by Major Tindal that went into Army channels." *See id.* ¶ 22.  The plaintiff clarified that he was now raising "a non-monetary claim to reconsider on factual error the agency decision

_____

[10] The plaintiff also alleged that "the NGB-directed MMRB later recommended Tindal to a MEB for disability processing."  Am. Compl. ¶ 19.

denying Tindal's request to grant a discretionary extension of AGR status, and denying

reinstatement in a Reserve active status after involuntary transfer to the Retired Reserve." *Id.*

¶ 45; *see also id.* (characterizing the plaintiff's claim as "[a] challenge to [a Board] decision

based on erroneous facts").[11]

Currently pending before the Court are three motions.  The first two are cross-motions for

summary judgment filed by each party.  The third motion, filed by the plaintiff, asks the Court to

supplement the administrative record with four new pieces of evidence.  These pieces of

evidence include:  (A) "Major Tindal's 'Request for Retention Beyond 20 Years," dated

February 27, 2002; (B) "Major Tindal's June 11, 2002 Army school and travel orders to Fort

Dix, N.J. to attend 'Command and General Staff Officer Course,'" (C) "Steven Tindal's

declaration, dated July 20, 2011 (explaining why Exhibits A and B were not available until 2008

when released by Oregon ARNG)," and (D) "[Plaintiff's] Counsel's Declaration, [dated]

November 18, 2010," which "offers relevant background information on past NGB practices

provided in [an] interview of a retired Army [NGB] Brigadier General."  *See* Pl.'s Mot.

Supplement at 1–2, ECF No. 24.  For the reasons discussed below, the Court grants the

defendant's motion for summary judgment, and denies the plaintiff's cross-motion for summary

judgment and motion to supplement the administrative record.

---

[11] As is clear from the plaintiff's allegations in the Amended Complaint, the existence or non-existence of the purported retention request is of central importance to this case and to the relief sought by the plaintiff.  As the defendant explains:  "Without the extension, Plaintiff can not be promoted pursuant to law and can not be reinstated to AGR status.  Therefore the success or demise of his relief naturally flows from the determination concerning his extension request."  Def.'s Mem. at 7.  The Court has not lost sight of the passage of years since the plaintiff was retired from active service.  Even had the plaintiff been promoted to the rank of Lieutenant Colonel in 2003, it is unlikely that he would be serving in an active-duty capacity currently.  Therefore, what is at stake in this case is not the plaintiff's reinstatement to active-duty service, but his retroactive promotion to the rank of Lieutenant Colonel, which would provide him with a larger military retirement salary.

## II.     LEGAL STANDARD

Under the APA, an agency action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Review of agency actions under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid."  *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).  In assessing an agency decision, the Court reviews whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 105 (1977).  "The scope of the Court's review under this standard 'is narrow and a court is not to substitute its judgment for that of the agency.'"  *United Steel v. Pension Benefit Guar. Corp.*, 839 F. Supp. 2d 232, 245 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983)). "[A] reviewing court may not set aside an agency [decision] that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute," so long as the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 42–43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

While judicial review of an agency's actions is generally narrow and subject to a presumption of validity, review of the Board's decisions in particular under the APA is "unusually deferential."  *See Piersall v. Winter*, 435 F.3d 319, 324 (D.C. Cir. 2006) (citing *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1514 (D.C. Cir. 1989)).  When reviewing a decision of the Board, this Court's "inquiry focuses not on whether the Army was 'substantively correct' . . . but

rather on whether the ABCMR's explanations for that choice demonstrate that defendants 'permissibly exercised [their] discretion and made a choice that is supported by at least substantial evidence.'" *Hill v. Geren*, 597 F. Supp. 2d 23, 29 (D.D.C. 2009) (citing *Homer v. Roche*, 226 F. Supp. 2d 222, 226 (D.D.C. 2002)).  The "plaintiff must overcome a strong presumption that the military administrators discharged their duties correctly, lawfully, and in good faith." *Escobedo v. Geren*, 602 F. Supp. 2d 244, 249 (D.D.C. 2009) (citing *Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997)).  To rebut this presumption "the plaintiff has the burden of showing by cogent and clearly convincing evidence that the decision was the result of a material legal error or injustice." *Id.* (citations and internal quotation marks omitted).

## III.   DISCUSSION

The Court will begin by addressing the merits of the plaintiff's motion to supplement the administrative record.  Next, the Court will address the defendant's argument that the plaintiff has waived certain arguments by failing to raise them before the agency.  Finally, the Court will discuss the merits of the parties' motions for summary judgment.

### A.   <u>Supplementing the Administrative Record</u>

Under the APA, "the court shall review the whole record or those parts of it cited by a party."  5 U.S.C. § 706; *see also Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) ("The record consists of the order involved, any findings or reports on which that order is based and 'the pleadings, evidence, and other parts of the proceedings before the agency.'" (quoting FED. R. APP. P. 16(a))).  Hence, "[i]t is a widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made." *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997); *accord Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("In applying [the arbitrary and

capricious] standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").[12]

"There are exceptional circumstances in which supplementation of the administrative record is appropriate due to some deficiency."  *Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010); *accord City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) ("[W]e do not allow parties to supplement the record 'unless they can demonstrate unusual circumstances justifying a departure from this general rule.'" (quoting *Tex. Rural Legal Aid v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991))); *Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior*, 667 F. Supp. 2d 111, 112 (D.D.C. 2009) ("A court that orders an administrative agency to supplement the record of its decision is a rare bird.").  The D.C. Circuit has recognized three narrow instances in which supplementation of an administrative record may be appropriate:  "(1) if the agency 'deliberately or negligently excluded documents that may have been adverse to its decision,' (2) if background information was needed 'to determine whether the agency considered all the relevant factors,' or (3) if the 'agency failed to explain administrative action so as to frustrate judicial review.'"  *City of Dania Beach*, 628 F.3d at 590 (quoting *American Wildlands*, 530 F.3d at 1002).  Underlying these exceptions, however, is the "strong presumption" that an agency has properly compiled the entire record of materials that it considered, either directly or indirectly, in making its decision.  *See, e.g.*, *Marcum*, 751 F. Supp. 2d at 78; *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006) ("Although an agency may not unilaterally determine what constitutes the administrative record, the agency enjoys a

---

[12] *See also Deukmejian v. Nuclear Regulatory Comm'n*, 751 F.2d 1287, 1325 (D.C. Cir. 1984) (en banc) ("Were courts cavalierly to supplement the record, they would be tempted to second-guess agency decisions in the belief that they were better informed than the administrators empowered by Congress and appointed by the President."), *vacated en banc in part on other grounds*, 760 F.2d 1320 (D.C. Cir. 1985); Steven Stark & Sarah Wald, *Setting No Records: The Failed Attempts to Limit the Record in Review of Administrative Action*, 36 ADMIN. L. REV. 333, 334 (1984) ("The reasoning behind record review is that if courts were to examine the evidence that was not before the agency when it made its decision, courts would be acting as independent decision makers, rather than as reviewing bodies whose limited task is only to check arbitrary actions by the executive branch.").

presumption that it properly designated the administrative record absent clear evidence to the contrary.").  To overcome that presumption, "a plaintiff must put forth concrete evidence that the documents it seeks to 'add' to the record were actually before the decisionmakers." *Marcum*, 751 F. Supp. 2d at 78; *accord Nat'l Mining Ass'n v. Jackson*, 856 F. Supp. 2d 150, 156 (D.D.C. 2012).

A doctrine related to "supplementing" the administrative record is when a court permits consideration of "extra-record evidence."  *See, e.g.*, *National Mining Ass'n*, 856 F. Supp. 2d at 156 ("A separate standard governs judicial consideration of extra-record evidence, which consists of evidence outside or in addition to the administrative record that was not necessarily considered by the agency." (internal quotation marks omitted)).  The D.C. Circuit has explained that "the familiar rule that judicial review of agency action is normally to be confined to the administrative record. . . . exerts its maximum force when the substantive soundness of the agency's decision is under scrutiny." *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989). Particularly when the procedural validity of an agency's action is in question, however, "it may sometimes be appropriate to resort to extra-record information to enable judicial review to become effective." *Id.*  Recently, the D.C. Circuit has cautioned that the exceptions announced in *Esch* are "narrow" and that, "at most [*Esch*] may be invoked to challenge gross procedural deficiencies."[13] *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013); *accord*

---

[13] In *Esch*, the D.C. Circuit listed eight potential circumstances in which consideration of extra-record evidence may appropriate:

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010)

(acknowledging that consideration of extra-record evidence "is the exception, not the rule").

As summarized above, the plaintiff has moved to "supplement the administrative record"

with four new exhibits.  *See* Pl.'s Mot. Supplement Admin. R., & Mem. in Supp. ("Pl.'s Supp.

Mem.") at 1, ECF No. 24.  Two of these documents appear to be personnel records of the

plaintiff: (A) a copy of his purported AGR retention request; and (B) a copy of the orders

directing him to attend a Command and General Staff Officer Course in June 2002.  *See id.*  The

other two documents are sworn declarations: (C) one by the plaintiff himself, explaining why

proposed Exhibits A and B were unavailable until 2008; and (D) one by the plaintiff's attorney,

recounting the contents of a conversation with a "retired National Guard Brigadier General"

which provided "relevant background information on past NGB practices."  *Id.* at 1–2.  At the

outset, although the plaintiff's motion is styled as one to "supplement the administrative record,"

the doctrine of supplementing the administrative record, discussed above, clearly does not apply

to the instant case because the plaintiff has not attempted to "put forth concrete evidence that the

documents [he] seeks to 'add' to the record were actually before the decisionmakers."  *See*

*Marcum*, 751 F. Supp. 2d at 78.  Thus, the Court will evaluate the plaintiff's motion as a request

for the Court to consider extra-record evidence.  Under that rubric, the Court concludes that the

plaintiff's motion to supplement should be denied for three reasons: (1) the plaintiff does not

challenge the procedural validity of the Board's decision; (2) none of the *Esch* exceptions cited

by the plaintiff apply; and (3) the two documents relied upon most heavily by the plaintiff bear

indicia of unreliability.

---

*Esch*, 876 F.2d at 991 (quoting Stark & Wald, *Setting No Records*, 36 ADMIN. L. REV. at 345).  More
recently, the D.C. Circuit "appears to have narrowed these exceptions to four: (1) when the agency failed to
examine all relevant factors; (2) when the agency failed to explain adequately its grounds for its decision;
(3) when the agency acted in bad faith; or (4) when the agency engaged in improper behavior."  *National
Mining Ass'n*, 856 F. Supp. 2d at 156–57 (citing *IMS*, 129 F.3d at 624).

1.       *The Plaintiff Does Not Challenge the Procedural Validity of the Board's Decision.*

As discussed above, the exceptions permitting consideration of extra-record evidence in an administrative law case "at most . . . may be invoked to challenge gross procedural deficiencies." *Hill Dermaceuticals*, 709 F.3d at 47; *see also Marcum*, 751 F. Supp. 2d at 79 ("The *Esch* exceptions are more appropriately applied in actions contesting the procedural validity of agency decisions."). In the instant case, however, the plaintiff does not challenge the procedural validity of the Board's decision. Rather, the gravamen of the plaintiff's claim is that the Board's decision was irrational and that its factual findings were not supported by substantial evidence, as discussed in more detail below. *See* Pl.'s Mem. Supp. Cross-Mot. for Summ. J. & Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 7–11, ECF No. 22-1. Thus, the substantive nature of the plaintiff's complaint about the Board's decision militates strongly against the consideration of extra-record evidence.

2.       *None of the Cited* **Esch** *Exceptions Apply.*

Moreover, as to the plaintiff's proffered Exhibits A and B, the Court is concerned that considering such evidence would be highly prejudicial to the Board because the plaintiff concedes that this evidence was available well before the 2010 Board decision at issue in this case. *See, e.g.*, Decl. of Steven Tindal ("Tindal Decl.") ¶ 2, ECF No. 24-3 (attached as proposed Ex. C) (explaining that proposed Ex. A was available as of 2008); Pl.'s Supp. Mem. at 1 ("Exhibits A and B were not available until 2008 . . . .). The plaintiff contends that the defendant prohibited him from submitting Exhibits A and B "or any other documents except those included within Tindal's 2006 BCMR application" and therefore the plaintiff argues that "Exhibits A [and] B . . . fall within an Esch exception permitting supplementing the record for evidence

previously unavailable." Pl.'s Supp. Mem. at 1, 3.[14]  As support for this assertion, the plaintiff

cites: (1) certain portions of the joint Motion to Remand; and (2) an e-mail conversation between

plaintiff's counsel and defendant's counsel discussing the terms of the remand, *id.* at 1, yet

neither of these documents supports the plaintiff's contention.  The portions of the joint Motion

to Remand cited by the plaintiff merely summarize the defendant's agreement to allow the

plaintiff to submit *other* pieces of new evidence (*i.e.*, two academic research papers) and state

that "[t]he ABCMR will not consider [the] new arguments [raised in the plaintiff's Complaint]

on remand."  *See* Mot. to Remand ¶¶ 8, 10.  If anything, the contents of this joint motion indicate

that the defendant was willing to have the Board consider new *evidence* supporting the plaintiff's

equitable arguments, even though it would not consider any new *arguments* not previously raised

in the 2006 Board proceeding.  *See id.*

Likewise, the e-mail conversation cited by the plaintiff provides no support for the

contention that the defendant or the Board foreclosed consideration of new, relevant evidence on

remand.  Much like the portions of the Motion to Remand discussed above, the e-mail

conversation indicates that defense counsel was concerned "about the ABCMR only considering

the *issues* placed before it in the original application."  *See* A.R. at 30 (emphasis added); *see also*

*id.* at 29 (objecting to submission of "three *arguments* that were never before the Board" and not

wanting to "re-argue the *issue* of whether the longevity policy is fair" (emphasis added)).

Indeed, plaintiff's counsel specifically eschewed the implication that he was trying to submit

new evidence at all; his sole objection to defense counsel's proposed remand motion, as set forth

in the e-mail conversation, was certain language "implying the complaint raises new evidence

not already before the [Board], not within its constructive knowledge."  *Id.* at 30.  Plaintiff's

---

[14] This, of course, assumes that the *Esch* exception for evidence previously unavailable is still recognized in this
Circuit, which has been called into question by more recent Circuit case law.  *See National Mining Ass'n*, 856 F.
Supp. 2d at 156–57 (citing *IMS*, 129 F.3d at 624).

counsel went so far as to state: "My intent in [the] Tindal complaint *is not to raise new argument or evidence*." *Id.* (emphasis added).

Plaintiff's counsel made the argument to defense counsel that the Board should consider the new evidence (academic research papers and previous Board decision) because they were "within [the Board's] constructive knowledge." *Id.* Yet, plaintiff's counsel never so much as implied the existence of Exhibits A and B, let alone discussed these documents as evidence that the plaintiff sought to be considered by the Board on remand, *see id.* at 29–30, despite the fact that the documents had allegedly already been in the plaintiff's possession for some time.  In fact, the plaintiff has offered no evidence to show that the defendant or the Board were ever aware of the existence of Exhibits A or B until the filing of the Amended Complaint in November 2010—after the Board had already made the September 2010 decision challenged in this case.  Defense counsel never objected to submitting the new evidence offered by the plaintiff and never "refused Tindal's submission on remand of any other documents except those before the [Board] in 2006," as the plaintiff contends.  *See* Pl.'s Supp. Mem. at 2.  Thus, the very evidence cited by the plaintiff demonstrates that, contrary to the plaintiff's contentions, Exhibits A and B do not "fall within an <u>Esch</u> exception permitting supplementing the record for evidence previously unavailable." *See id.* at 3.[15]

The plaintiff argues that Exhibit D—the declaration by plaintiff's counsel summarizing the information about NGB practices ostensibly conveyed to him by a retired Army National Guard Brigadier General—should be considered, either as "evidence previously unavailable" or as "'background material' that is not argumentative but 'primarily explanatory in nature.'" *See id.* at 3–4 (quoting *Corel Corp. v. United States*, 165 F. Supp. 2d 12, 31 (D.D.C. 2001)).  As to

---

[15] Also, because the sole purpose of Exhibit C is to "explain[] why . . . Exhibits A and B were not available until 2008," *see* Pl.'s Suppl. Mem. at 1, Exhibit C likewise does not fall within any *Esch* exception.

the unavailability exception,[16] the plaintiff stated in his Amended Complaint that the Brigadier

General "was not available to comment until 2010," *see* Am. Compl. ¶ 16, and plaintiff's counsel

elaborated in Exhibit D that, prior to 2010, the source of the information was addressing various

health issues affecting her family members, *see* Pl.'s Ex. D, ECF No. 29 (filed under seal). This

is hardly compelling support, and it is not sufficient to overcome the weighty presumption that a

court should limit its review to the record before the agency at the time of its decision. Although

the family health issues outlined in the sealed version of Exhibit D are undoubtedly serious, they

do not rise to the level of rendering the source's information *unavailable*, particularly because it

appears that at least some of those family issues persisted through the time the source spoke with

plaintiff's counsel. *See id.* Absent some further explanation regarding the prior unavailability of

this evidence, it appears at least equally likely that the plaintiff simply did not think to obtain this

evidence until it became clear that the Board's 2010 decision was adverse to him.[17]

As to the exception for "background information," that exception does not apply to

proposed Exhibit D for several reasons. First, the "background information" exception has been

interpreted by the D.C. Circuit to apply only when such information is necessary to help the

court understand the reasons for the agency's action, or to ensure that the agency considered all

relevant factors. *See James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir.

1996); *Envtl. Defense Fund*, 657 F.2d at 285–86. Second, such "background information" is

generally supposed to come from those who "participated in the pertinent agency actions," not

from third parties purporting to act as *de facto* expert witnesses regarding the practices of the

agency in question. *See Envtl. Defense Fund*, 657 F.2d at 286. Finally, any "background

---

[16] Once again, this discussion assumes *arguendo* that this unavailability exception is still recognized in this Circuit. *Contra National Mining Ass'n*, 856 F. Supp. 2d at 156–57.

[17] Indeed, it is difficult to conclude that it is mere coincidence that the information in Exhibit D "was provided November 18, 2010," Am. Comp. ¶ 16—a mere forty-five days after the plaintiff was notified of the Board's decision, *see* A.R. at 2.

information" submitted "can never . . . examine the propriety of the decision itself." *Id.* Yet,

Exhibit D runs afoul of each of these principles: (1) it is not necessary to help the court ascertain

whether the agency considered all relevant factors or the reasons for the agency's action; (2) it

does not come from any member of the Board or other person who participated in the Board's

decisionmaking process in this case; and (3) it is submitted essentially as a third-party expert

affidavit, challenging the merits of the Board's decision.[18]  As a result, the Court concludes that

the extra-record evidence in the plaintiff's proffered Exhibit D does not fall within any

recognized exception to the general rule limiting APA review to the record before the agency at

the time of its decision.

### 3. *Exhibits A and D Bear Indicia of Unreliability.*

In addition to all of the above-discussed reasons for denying the plaintiff's motion to

supplement the administrative record, the Court also has concerns regarding the reliability of the

two pieces of evidence relied upon most heavily by the plaintiff in his briefing: Exhibits A and

D.  As the defendant points out, there are serious questions about the authenticity of Exhibit A,

which the plaintiff says is a copy of his AGR extension request.  First, Exhibit A contains no

endorsement signatures or other indications that it was administratively processed.  *See* Def.'s

Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. & Def.'s Opp'n to Pl.'s Cross-Mot. for Summ.

J. ("Def.'s Reply") at 12 n.5, ECF No. 30.  Second, it was purportedly obtained from the Oregon

Military Department, *see* Tindal Decl. ¶ 2, but the official within the Oregon Military

---

[18] That the information in Exhibit D is being offered to challenge the merits of the Board's decision is obvious from the face of the Amended Complaint, which uses the information contained in Exhibit D to contend that "Tindal's extension request was in fact submitted because NGB medically flagged the application for Tindal's 3P permanent profile for diabetes."  *See* Am. Compl. ¶¶ 15–19.  The nature of Exhibit D as a *de facto* expert affidavit is likewise apparent from the plaintiff's cross-motion for summary judgment, in which he cites the information in Exhibit D to bolster his argument that the Board erred in failing to conclude that the plaintiff's MMRB proceedings "[s]uspen[ded]" his purported AGR extension request.  *See* Pl.'s Opp'n at 5, 9; *see also* Pl.'s Joint Reply to Def.'s Opp'n to Cross-Mot. for Summ. J. & Mot. to Supplement the Admin. R. ("Pl.'s Reply") at 5, ECF No. 33.  The use of purported "background information" in this way "would be contrary to decisions of the Supreme Court and of [the D.C. Circuit]."  *Envtl. Defense Fund*, 657 F.2d at 286.

Department responsible for maintaining personnel records has submitted a sworn declaration stating that his office has no record of any such document in the plaintiff's personnel file, and his office also has no record of correspondence with the plaintiff regarding such a document, *see* Decl. of Michael Gillett ("Gillett Decl.") ¶¶ 3–4, ECF No. 32-1.[19]

Exhibit D is a redacted version of a sworn declaration from the plaintiff's counsel, which purports to recount a telephone conversation with an anonymous individual about "past NGB procedures or practices on AGR assignments involving possible medical disqualification." *See* Decl. of John A Wickham ("Wickham Decl.") ¶ 1, ECF No. 24-4. Of principal concern with regard to this document, the plaintiff has offered no reason why this information had to be submitted as blatant hearsay, rather than having "the source" him or herself submit a sworn declaration attesting to such procedures or practices. In his motion to file the declaration under seal, the plaintiff referenced the fact that "the source has expressed fears of reprisal or other adverse action by [the] military, officials from the NGB, or others," *see* Pl.'s Mot. for Leave to File Decl. Under Seal ("Pl.'s Seal Mot.") at 1, ECF No. 28, but the identity of "the source" is no secret. The plaintiff *named* the source in his Amended Complaint, stating that "[t]he information on past NGB practices . . . was provided . . . by Brigadier General Julia Cleckley, ARNG (ret.)." *See* Am. Compl. ¶ 16. Furthermore, the plaintiff does not explain how General Cleckley could legitimately fear reprisal, in light of the fact that she appears to be retired and no longer serves in the chain of command. *Id.*; *see also* Pl.'s Seal Mot. at 1. Even assuming that the source of the information were anonymous, he or she still could have submitted a sworn declaration under seal

---

[19] Additionally, the defendant argues that Exhibit A "only evidences, if anything, an intent to request retention. Nothing more." Def.'s Reply at 12 n.5. The defendant may very well be correct that Exhibit A, which is a bare-bones request for retention, does not contain all of the information that is required to constitute a full retention request "packet" referenced in the Administrative Record. *See* A.R. at 62. Yet, the defendant does not support his assertion with any authority indicating what other items the plaintiff would have been required to include with his extension request for it to satisfy Army or National Guard regulations.

if reprisal were a legitimate concern.  In short, these indicia of unreliability further support the

conclusion that proposed Exhibits A and D should not be retroactively added to the

Administrative Record.[20]

As the foregoing discussion makes clear, the plaintiff has not established the "exceptional

circumstances" required to permit supplementation of the administrative record.  *See Marcum*,

751 F. Supp. 2d at 78.  Nor has the plaintiff established that the proffered evidence, in the

context of the instant case, qualifies for any of the "narrow" exceptions permitting consideration

of "extra-record evidence."  *See Hill Dermaceuticals*, 709 F.3d at 47.  Therefore, the Court will

deny the plaintiff's motion to supplement the administrative record and will not consider the

exhibits submitted by that motion in adjudicating the merits of the plaintiff's claim.

### B.   Waiver

Next, the Court will address the defendant's argument that the plaintiff has waived

certain arguments by failing to raise them before the Board.  To put the defendant's waiver

argument in context, the Court must first summarize the argument that the plaintiff has arguably

waived.  The plaintiff argues in his cross-motion for summary judgment that the Board's

conclusion that there was no evidence that the plaintiff requested an extension of his active-duty

service is contradicted by the fact that the plaintiff was processed through an MMRB.  *See* Pl.'s

Opp'n at 7–8; *see also id.* at 4–5.  The logic of this argument (the "MMRB/extension request

argument") is that an MMRB would not have been ordered unless the plaintiff had requested to

be retained in active duty.  *See id.* at 8.  Relatedly, the plaintiff also contends that the Board

failed to consider the "regulatory presumption" that "a proper [extension] request submitted

---

[20] Although these indicia of unreliability may render such documents inadmissible under the Federal Rules of
Evidence, the Court does not draw any conclusions about whether such documents would be *per se* inadmissible
before the Board.  As the plaintiff points out, the Board is "'not bound by formal rules of evidence.'"  *See* Pl.'s
Reply at 5–6 (quoting Pl.'s Reply App. at 12, ECF No. 33-1).

earlier was the reason NGB directed an MMRB when presented with Tindal's permanent medical condition." *See id.* at 10.  The defendant argues, in response to these arguments, that "[n]ot once does Plaintiff's application or supplemental statement [to the Board] state or even suggest that his extension request caused his MMRB referral." *See* Def.'s Reply at 9.  Hence, the defendant argues that the plaintiff has "waived this argument by failing to raise the issue to the agency." *Id.* at 10.

"Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952).  Hence, the D.C. Circuit has consistently held that courts "are bound to adhere to the 'hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review.'" *Coburn v. McHugh*, 679 F.3d 924, 929 (D.C. Cir. 2012) (quoting *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) (per curiam)); *accord CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079 (D.C. Cir. 2009) (acknowledging the "well-established doctrine of issue waiver, which permits courts to decline to hear arguments not raised before the agency where the party had notice of the issue").  This principle applies to legal, as well as factual, arguments. *See Nuclear Energy Institute*, 373 F.3d at 1290 ("To preserve a legal or factual argument, . . . [a] proponent [must] have given the agency a 'fair opportunity' to entertain it in the administrative forum before raising it in the judicial one." (quoting *Wash. Ass'n for Television & Children v. FCC*, 712 F.2d 677, 681 (D.C. Cir. 1983))).  The D.C. Circuit has very recently clarified that the standard for waiver in administrative law cases focuses on whether the "specific argument" put

forth by the plaintiff was raised before the agency.  *See Koretoff v. Vilsack*, 707 F.3d 394, 398

(D.C. Cir. 2013).  Under this standard, this Circuit "require[s] 'the argument [the plaintiff]

advances here' to be raised before the agency, not merely the same general legal issue."  *Id.*

(quoting *Nuclear Energy Institute*, 373 F.3d at 1291).

In response to the defendant's contention that the plaintiff waived the opportunity to raise

the MMRB/extension request argument, the plaintiff first argues essentially that it was not *his*

duty to bring this argument to the Board's attention.  In this regard, the plaintiff argues that the

Board has a "moral duty to address the true nature of any injustice," implying that the Board

should have read between the lines of the plaintiff's application in the name of justice.  *See* Pl.'s

Reply at 1–2.  Similarly, the plaintiff dismisses the defendant's waiver argument as "semantic

quibbling," because the plaintiff "was not required to hand-hold an agency, particularly here with

the [Board]'s presumed regulatory expertise on the elementary purpose of the [MMRB]."  *Id.* at

6.  In this same vein, the plaintiff characterizes his MMRB/extension request argument as "a

regulatory fact," which "does not constitute a separate claim or argument of error or injustice."

*Id.*  Finally, the plaintiff argues that he placed the Board "on notice" of the MMRB/extension

request argument when he: (1) "explained the function of an MMRB" and "alleged that at the

time he submitted his extension request for approval, NGB 'instead' referred him to the

MMRB;" (2) "explained that further action on his pending extension request was 'suspended'

when NGB directed he undergo the MMRB;" (3) "explained that while final action on his

extension request was pending, NGB directed an MMRB to determine if he was fit 'to continue

his career;" and (4) "noted that the result of the MMRB was 'approval to continue' as an AGR."

*Id.* at 6–7.

26

First, the plaintiff's arguments about not being required to "hand-hold an agency" and the Board having a "moral duty to address the true nature of any injustice," *see id.* at 2, 6, downplay the plaintiff's responsibilities as a party claiming relief before an administrative agency. Although the Board may have the "moral duty" cited by the plaintiff, that duty is no more demanding than the duty of every administrative agency to "consider [the] important aspect[s] of the problem" before it. *See, e.g.*, *State Farm*, 463 U.S. at 43. Moral duty or no moral duty, the Board is not required to make a claimant's case for him or sift through the materials submitted by a claimant to discern whether any implied arguments are being made. *Cf. Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1231 (D.C. Cir. 2007) ("Objections must be prominent and clear enough to place the agency 'on notice,' for EPA is not required 'to cull through all the letters it receives and answer all of the possible implied arguments.'"). It is the claimant's responsibility, in the first instance, to lay out his arguments in a reasonably clear fashion, so that the Board can have a "fair opportunity" to consider them. *See, e.g.*, *Nuclear Energy Institute*, 373 F.3d at 1290. This is particularly true when the claimant is represented by counsel, as the plaintiff was during his 2010 Board proceedings. *See* A.R. at 16. By that same token, although an expert administrative agency like the Board is presumptively familiar with the contents and meaning of its own rules and regulations, an agency is not required to anticipate and address every possible argument a party *might have made* to it based on those rules and regulations.

Similarly, the plaintiff's attempt to cast his MMRB/extension request argument as a "regulatory fact," rather than "a separate claim or argument of error or injustice," is unpersuasive. *See* Pl.'s Reply at 6. Although the plaintiff lays out four aspects of his submission to the Board, which he claims put the Board "on notice" of his MMRB/extension request

argument, *see id.* at 6–7, it is clear that the MMRB/extension request argument is a distinct

contention that was absent from his submissions to the Board.  Indeed, further examination of the

plaintiff's submissions to the Board reveals that the plaintiff actually attempted to *separate*,

rather than connect, his purported extension request and his MMRB processing.  First, the

plaintiff stated in his 2010 submission to the Board that he had previously "indicated that 'time

ran out' on his pending [active federal service] extension request when NGB directed he undergo

*unnecessary* disability proceedings."  *See* A.R. at 32 (emphasis added); *see also id.* at 17 (stating

to the Board that "NGB directed [the plaintiff] undergo *unnecessary* MOS and MEB processes"

(emphasis added)).  That the plaintiff at least twice characterized his MMRB processing as

"unnecessary" could fairly be read to contend that the MMRB processing was unrelated to his

purported extension request.  At the very least, characterizing his MMRB processing as

"unnecessary" could not have reasonably put the Board on notice that the plaintiff considered his

MMRB processing to be a *necessary* result of his extension request, which he now argues before

this Court.  The plaintiff also contended in his submissions to the Board that his purported

extension request was "suspended" while he underwent MMRB processing, *see id.* at 17, and

that the NGB required an MMRB "[*i*]*nstead of* processing [his] routine extension request, *see id.*

at 40 (emphasis added).  These statements also strongly implied that the plaintiff was arguing

that his MMRB processing was parallel and distinct from the processing of his extension request.

It is perhaps true that the plaintiff's reference twice in his Board submissions to "continu[ing]"

his career, *see id.* at 41–42, in relation to his MMRB processing could be read to imply a

causative relationship between the plaintiff's extension request and his MMRB, but it was more

than reasonable for the Board not to make that tenuous inference, particularly in light of the

plaintiff's other statements just discussed.

28

In short, the plaintiff never argued before the Board that his MMRB processing was proof that he submitted an extension request.  Indeed, the plaintiff never drew *any* connection (causative or otherwise) between his purported extension request and his MMRB processing that would have reasonably put the Board on notice that the plaintiff was offering his MMRB processing as evidence that he in fact submitted an extension request in the first place.  As a result of this omission, the plaintiff has waived his ability to make that argument in this Court. *See, e.g.*, *Koretoff*, 707 F.3d at 398.  The Board never had a fair opportunity to address that argument, and therefore this Court cannot fault the Board for not doing so.

### C.   The Plaintiff Has Not Demonstrated Any Error in the Board's Decision

Even assuming *arguendo* that the plaintiff *had* argued that the MMRB was proof of the existence of his extension request, the plaintiff still would not be able to demonstrate any error in the Board's decision that would warrant vacatur or reversal under the APA.

First and foremost, the plaintiff has not demonstrated that the Board was unreasonable in not applying the "regulatory presumption" that "a proper [extension] request submitted earlier was the reason NGB directed an MMRB when presented with Tindal's permanent medical condition."  *See* Pl.'s Opp'n at 10.  As the Court discussed above in reviewing the Army's personnel regulations, an MMRB proceeding is not automatically triggered by the submission of a request for selective retention.  *See supra* Part I.A. (outlining relevant regulatory framework). Instead, Army regulations only specify, in relevant part, that referral to an MMRB is required when (1) a soldier is issued a permanent physical profile with a numerical designator of 3 or 4; or (2) a soldier was previously cleared by an MMRB, but "[t]he condition for which the soldier was previously retained deteriorates or the soldier is given additional duty limitations for the

condition." *See* Army Reg. 600-60 ¶ 2-2b.  Thus, referral to an MMRB is not necessarily related

at all to whether a soldier is being processed for a selective retention request.

The defendant argues that "Plaintiff's voluntary retirement explains the basis for

Plaintiff's medical processing" because voluntary retirement "requires a medical examination."

*See* Def.'s Reply at 16; *see also* Army Reg. 600-8-24 ¶ 6-6 ("Medical examination prior to

retirement is required.").  The plaintiff counters, however, that "an MMRB is not a 'medical

examination' nor can it be part of retirement processing."  Pl.'s Reply at 2.  Neither party cites to

Army regulations to support his argument on this point, and Army Regulation 600-8-24 does not

define what constitutes a "medical examination" incident to retirement.  Army Regulation 600-8-

24 states only that "[t]he officer's immediate commander will ensure the medical examination is

processed according to [Army Regulation] 40–501."  *See* Army Reg. 600-8-24 ¶ 6-6.  That

referenced regulation, in turn, states that retirement "medical examinations" are required to

include several elements, including a full clinical evaluation, but they do not appear to require

referral to an MMRB or an MEBD.  *See* Army Reg. 40-501 ¶ 8-12.  Therefore, the regulatory

underpinning is elusive for the defendant's argument that the retirement "medical examination"

would have necessarily triggered the plaintiff's referral to an MMRB.

As a matter of fact, the Administrative Record provides no factual basis at all, under

applicable Army regulations, for the plaintiff to be referred to the MMRB in 2002.  The plaintiff

had been issued a permanent physical profile of "3" as a result of his diabetes, but that occurred

in 1998, *see* Am. Comp. ¶¶ 6, 9, which was approximately four years before he was actually

processed through an MMRB in 2002.  According to Army regulations, the plaintiff should have

been referred to an MMRB at the time he was issued a permanent physical profile of "3," *see*

Army Reg. 600-60 ¶ 2-2.a, but he was not, *see* Am. Compl. ¶ 9.  Read as a whole, the

Administrative Record suggests, but does not compel, the conclusion that the plaintiff's

processing through an MMRB was the result of an administrative error, rather than a retention

request.  Most notably, an August 23, 2002 e-mail from the plaintiff's Physical Evaluation Board

Liaison Officer ("PEBLO"), which the plaintiff cited to the Board and cites in his Amended

Complaint, *see* A.R. at 40–41; Am. Compl. ¶ 34, stated that the plaintiff "ha[d] not overcome the

presumption of fitness rule" contained in Army Regulation 635-40 ¶ 3-2b(2).  *See* A.R. at 61.

That presumption of fitness only applies "[w]hen a soldier is being processed for separation or

retirement."  *See* Army Reg. 635-40 ¶ 3-2b(2).  Furthermore, the plaintiff's PEBLO explicitly

noted in his August 23, 2002 e-mail—just over a week before the plaintiff's retirement date—

that "[a]t the present time, you [Major Tindal] have submitted [an] application for length of

service retirement and are presumed fit for duty."  A.R. at 61.  The PEBLO never referenced any

pending retention request, despite the plaintiff's contention that such a request was the primary

catalyst for his referral to the MMRB.  *See id.*  This is substantial evidence that the plaintiff's

referral to an MMRB was unrelated to any purported extension request.[21]

Furthermore, the Board's decision to deny the plaintiff's requested relief is also

supported by the July 30, 2002 e-mail from an NGB personnel staff officer, which the plaintiff

submitted in support of his application.  *See* A.R. at 7, 62.  That e-mail, which the Board

specifically discussed, *see id.* at 7, 12, stated that, as of July 30, 2002, the plaintiff was still

"working his packet and will forward it to [the NGB personnel officer] when it is complete."  *Id.*

at 62.  As the Board observed in its decision, this e-mail "shows that, as late as 30 July 2002, the

applicant had not forwarded a package to the NGB office responsible for granting extensions."

*Id.* at 12.  The Court agrees with the reasoning of the Board on this point and finds that the

---

[21] The plaintiff even agreed with this interpretation of his MMRB in his original Complaint, wherein he alleged that
"the [NGB] in May 2002 directed Major Tindal be processed *for disability retirement* through a MEB and MMRB,
both at Fort Jackson, S.C."  *See* Compl. ¶ 27 (emphasis added).

Board's conclusion that the plaintiff had not submitted an extension request is supported by substantial evidence.[22]  As a result, the plaintiff's contentions that "the [Board] relied on erroneous facts" and reached conclusions that were "contradicted" by Army regulations, *see* Pl.'s Opp'n at 9–11, is unsupported by the record.[23]

Finally, even had the plaintiff been able to present evidence that he submitted a retention request, the Board's alternative conclusions that (1) "[h]ad such a request been submitted earlier, it appears the NGB could have had it approved with a waiver or pending the MMRB," and (2) "there is no evidence [the retention request] was submitted early enough to allow the NGB to process it prior to [the plaintiff's] retirement," *see* A.R. at 12–13, were substantially supported by military regulations.  First, it is clear that, even assuming the plaintiff had submitted a selective retention request packet in February 2002, that submission would have been in violation of National Guard regulations, which state that retention requests "should be forwarded to [Army NGB headquarters] *12 months prior* to the soldier completing maximum years of Active Federal Service."  *See* NGR 600-5 ¶ 5-4a(3) (1990) (emphasis added).  Under that regulation, the plaintiff's retention request should have been forwarded no later than September 1, 2001.  Additionally, it is clear that Army regulations do not permit the "clock [to] r[u]n out" on a retention request due to medical processing, *see* Compl. ¶ 36, as the plaintiff has suggested it did in this case.  Army regulations make clear that, for a soldier like the plaintiff who was "[a]n active duty officer who [was] within 1 year of [the] date of mandatory retirement for age or

---

[22] The plaintiff argues that "at first impression, [the July 30, 2002 email merely suggests that [the personnel officer's] version of Tindal's extension packet was 'not complete.'"  *See* Pl.'s Opp'n at 10 (emphasis omitted).  There is no basis in the record to draw such a conclusion, however.  The July 30, 2002 e-mail makes no reference to multiple "version[s]" of the extension request packet, or that any other "version" of the packet had in fact been submitted through appropriate channels.  *See* A.R. at 62.

[23] Indeed, the plaintiff's multiple uses of the word "perhaps" in his argument on this point speak volumes.  *See id.* at 10.  The plaintiff's speculation about the meaning of the limited evidence relating to the existence or non-existence of his extension request is insufficient to overcome the substantial evidence supporting the Board's conclusions, particularly considering the "unusually deferential" standard of review that applies to review of the Board's decisions.  *See, e.g.*, *Piersall*, 435 F.3d at 324; *Hill*, 597 F. Supp. 2d at 29.

length of service," he would have been exempted from an MMRB unless he still had "sufficient time remaining to be eligible for reassignment and receive assignment instructions." *See* Army Reg. 600-60 ¶ 2-3f. Further, Army regulations state that when a solider is processed through an MMRB, "re-enlistment or extension of enlistment will not be denied on medical grounds." *Id.* ¶ 3-7c. In short, it would have been contrary to the normal operation of multiple Army regulations for the plaintiff to have been denied an active-service extension simply because he was referred to an MMRB, particularly if, as the plaintiff contends, the entire purpose of the MMRB was to facilitate such an extension. Hence, in addition to the reasons previously discussed, the cited Army regulations further bolster the reasonableness of the Board's conclusion that the plaintiff never submitted a proper selective retention request.

In line with the foregoing discussion, the Court concludes that the Board's "explanations for [its] choice demonstrate that [it] 'permissibly exercised [its] discretion and made a choice that is supported by at least substantial evidence.'" *Hill*, 597 F. Supp. 2d at 29. Although the plaintiff seeks *de novo* review of the Board's analysis, it is not this Court's place to determine whether the Board's decision was "substantively correct." *Id.* The Board's decision was neither "arbitrary and capricious" nor "unsupported by substantial evidence," and therefore the defendant is entitled to judgment as a matter of law. Accordingly, the defendant's motion for summary judgment will be granted, and the plaintiff's cross-motion for summary judgment will be denied.

It is unfortunate that, after a long and productive career in the U.S. Army, the plaintiff's tenure came to such a contentious conclusion. Although the plaintiff will not retire at the rank of Lieutenant Colonel as a result of the Board's decision, his twenty-plus years of distinguished service to this country should be a source of continued satisfaction and pride.

33

**IV.      CONCLUSION**

As the foregoing discussion concludes, the plaintiff has not established sufficient grounds

to supplement the administrative record in this action, and therefore the plaintiff's motion to

supplement the administrative record is denied.   Furthermore, the plaintiff waived his ability to

argue, as he attempts to argue before this Court, that his referral to an MMRB was offered as

evidence that the plaintiff had submitted an active-duty extension request.   Finally, the Court

concludes that the plaintiff has not presented any sufficient grounds to set aside the Board's

September 2010 decision to deny the plaintiff the relief he requested.   As a result, the

defendant's motion for summary judgment is granted, and the plaintiff's cross-motion for

summary judgment is denied.

An appropriate Order accompanies this Memorandum Opinion.

Date: May 23, 2013

/s/ *Beryl A. Howell*

BERYL A. HOWELL
United States District Judge